UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

CRYSTAL LIMARY, an individual

Plaintiff,

v.

UNITED PARCEL SERVICE, INC., a
Delaware corporation, and JOHN/JANE
DOES I-X, whose true identities are
unknown,

Defendants.

Case No. 1:15-CV-00394-EJL

**MEMORANDUM DECISION AND
ORDER**

Before the Court in the above entitled matter is the Defendants' Motion for Summary Judgment. (Dkt. 17.) The parties have filed responsive briefing and the Motion is ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motion shall be decided on the record before this Court without oral argument.

## FACTUAL BACKGROUND

This is a gender discrimination and retaliation suit brought under Title VII of the Civil Rights Act and the Idaho Human Rights Act. On August 28, 2007, Plaintiff, Crystal Limary, began working as a temporary employee for Defendant United Parcel Service, Inc. ("UPS"). (Dkt. 21, ¶ 3.) She worked as a part-time Customer Counter Associate on the day shift at the Boise UPS Center. *Id.* This position became permanent in March 2008. *Id.*

In 2009, Ms. Limary's daughter received a combination of diagnoses including a rare genetic disorder that makes her prone to extreme behavioral incidences. (Dkt. 21, ¶ 4.) That same year, Ms. Limary was relocated from the Boise UPS Center to the Nampa UPS Center. *Id.* When she was transferred from Boise to Nampa, Ms. Limary communicated to UPS her need to remain on day shift due to difficulties finding suitable childcare for her disabled daughter. *Id.*

At first, while in Nampa, Ms. Limary worked under the supervision of Blaine Hemmert. (Dkt. 21, ¶ 5.) Ms. Limary enjoyed a solid working relationship with Mr. Hemmert and, in 2010, she was promoted to Part-Time Package Center Supervisor (PTPCS). *Id.* At the time she was promoted, Mr. Limary again communicated to UPS her need for daytime hours. *Id.*

As a PTPCS, Ms. Limary's role was to supervise drivers and package handlers to ensure all assigned duties were accomplished safely and timely. (Dkt. 17-1.) According to UPS, Ms. Limary was a salaried, non-union, at-will employee as a member of UPS management. (Dkt. 17-1.)

In 2011, Mr. Hemmert retired and was replaced by Kevin Tolbert who worked as the Business Manager of the UPS Nampa Center. (Dkt. 21, ¶ 6.) Ms. Limary immediately observed that Mr. Tolbert favored male employees and treated female employees poorly. *Id.* For example, Ms. Limary received an unfavorable performance evaluation for the first time after Mr. Tolbert became her supervisor and Mr. Tolbert referred to females in the workplace as old and needing to retire, stupid bitches, as lacking in intelligence, and old hags. *Id.*

On January 4, 2013, Ms. Limary emailed Evan Johnson, Idaho Human Resources Manager, a letter requesting a hardship transfer from the Nampa UPS Center to the Boise UPS Center. (Dkt. 21, Ex. 2.) Ms. Limary sought to return to the Boise Center due to her daughter's medical needs, vehicle maintenance costs, and fuel costs. *Id.*

Despite this transfer request and Ms. Limary's previous statements concerning her need to remain on the day shift, in the mid to latter part of January 2013, Ms. Limary was informed she would be reassigned to the night shift at the Nampa Center. (Dkt. 20-1, ¶ 11; Dkt. 17-14. Limary Depo. at 147.) UPS explains that Ms. Limary was asked to take over the night shift because one of the PTCPSs retired and Ms. Limary had the least seniority of the three remaining PTPCSs. (Dkt. 17-2, ¶ 2.)

In February 2013, Ms. Limary "reported Mr. Tolbert for violating [UPS's] Code of Business Conduct." (Dkt. 20.) Specifically, Ms. Limary reported to Mr. Johnson and Anthony Nelson, the Area Human Resources Manager, that Mr. Tolbert used derogatory and inappropriate terms, such as "old hag" and "stupid bitch" in reference to her female coworkers. (Dkt. 21, ¶ 7.) Ms. Limary also explained to Mr. Johnson and Mr. Nelson that she believed Mr. Tolbert treated female employees less favorably than male employees and that his statements were "consistent with the way in which [he] had behaved towards women since he replaced Mr. Hemmert." *Id.*

After making the report against Mr. Tolbert, on or around March 1, 2013, Ms. Limary's hardship transfer request was denied. (Dkt. 21, ¶ 10.) Ms. Limary argues that "she was clearly eligible for the transfer per UPS policy due to [her daughter's] severe disability." (Dkt. 20.) Mr. Nelson told Ms. Limary her request was denied "due to the fact

that her Quality Performance ("QPR") scores were below fully acceptable," which Ms. Limary contests. (Dkt. 20.)

Ms. Limary further alleges that, after making the report against Mr. Tolbert, she was constantly harassed over her wardrobe, even though her wardrobe had not changed and she was compliant with the UPS dress code. (Dkt. 21, ¶ 15.) In addition, in June 2013, Ms. Limary expressed an interest in a driver position and did not hear back from UPS and, in August 2013, Ms. Limary contends she was harassed with phone calls when she went on leave for three days to tend to her son who had been admitted to the hospital. (Dkt. 21, ¶ 17.)

On September 11, 2013, Ms. Limary filed a Charge of Discrimination against UPS with the Idaho Human Rights Commission (IHRC) alleging workplace discrimination based on her sex and her daughter's genetic disability and that she suffered retaliation after reporting Mr. Tolbert's conduct to HR. (Dkt. 21, ¶ 17-19.) While the Charge was pending, Ms. Limary states the harassment continued and Mr. Tolbert instructed her co-workers to blame her for any mistakes made in her section and "dig up as much dirt as possible" about her. (Dkt. 21, ¶ 19-21.) Ms. Limary also claims Mr. Tolbert staged a surveillance camera to monitor her during her work hours. (Dkt. 21, ¶ 22.) In addition, Ms. Limary was passed over twice when opportunities became available on the day shift. (Dkt. 21, ¶ 23.)

Ms. Limary continued to work for UPS until November 20, 2014 when she filed a Family and Medical Leave Act ("FMLA") request for continuous leave through February 20, 2015. (Dkt. 17-1.) UPS granted her leave request. (Dkt. 17-1.)

In January 2015, Mr. Tolbert was rotated to the Twin Falls Center and his position with the Nampa Center was filled by Brad Shreeve. (Dkt. 17-9, Tolbert Affidavit ¶ 11.) Nevertheless, even with Mr. Tolbert out of the office, Ms. Limary did not return to work on February 20, 2015. (Dkt. 17-1.) In addition, Ms. Limary did not respond to UPS notifications that additional documentation was needed for her unexcused absences. *Id.*

On April 2, 2015, Ms. Limary met with Mr. Shreeve at the Nampa Center and participated in a telephone conference with Tina Lahaszow, then Area Human Resources Manager. (Dkt. 17-1.) Ms. Lahaszow explained that in order for Ms. Limary to return to work she needed to provide UPS with documentation from her healthcare provider so UPS could retroactively modify her unexcused leave from February 20, 2015 to April 2, 2015. (Dkt. 17-1.)

On April 3, 2015, Ms. Limary's healthcare provider sent UPS the requested documentation stating that during Ms. Limary's absence she was unable to perform "customer service, organization, [and] supervision," which were all essential functions of her position. (Dkt. 17-1; Dkt. 17-14, Ex. 3.) Mr. Shreeve informed Ms. Limary that she could return to work as soon as UPS received information that released her to perform the essential functions of her position. (Dkt. 17-1.)

On April 21, 2015, Ms. Limary, through her attorney, sent UPS a letter notifying them of her resignation. (Dkt. 17-1.) Ms. Limary contends she was constructively discharged given the discriminatory and retaliatory conduct she experienced at UPS beginning in or around February 2013. (Dkt. 21, Ex. 8.)

On August 10, 2015, after exhausting all administrative remedies, Ms. Limary filed suit against UPS in the District Court of the Fourth Judicial District. (Dkt. 1-2.) Before UPS filed an Answer, Ms. Limary filed her First Amended Complaint and Demand for Jury Trial. (Dkt. 1-2, pp. 31-54.) In this pleading, Ms. Limary brings four claims against UPS: sex discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Idaho Human Rights Act and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Idaho Human Rights Act.

On September 9, 2015, UPS removed the case to this Court pursuant to 28 U.S.C. § 1441(a) and (c). (Dkt. 1.) Just over a year later, on September 16, 2016, UPS filed the instant Motion asking the Court to grant summary judgment in its favor on all of Ms. Limary's claims. (Dkt. 17.)

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Summary judgment is "not a disfavored procedural shortcut," but is the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Rule 56 mandates summary judgment if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.

To show the material facts are not in dispute, a party may cite to particular parts of the record, or show that the materials cited in the record do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The materials presented by the parties must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Court does not make credibility determinations or weigh the evidence put forth by the non-moving party. *Anderson*, 477 U.S. at 255; *Hughes v. United States*, 953 F.3d 531, 541 (9th Cir. 1992). The evidence, including all reasonable inferences which may be drawn therefrom, must be viewed in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 252. Direct testimony of the non-movant must be believed, but the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See Leslie v. Grupo ICA*, 198 F.3d 1153, 1159 (9th Cir. 1999); *McLaughlin v. Lui*, 849 F.2d 1205, 1208 (9th Cir. 1988).

**DISCUSSION**

The federal and state gender discrimination and retaliation claims are addressed together because claims brought under the Idaho Human Rights Act are analyzed in the same manner as claims brought under their equivalent federal statutes. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888 n.4 (9th Cir. 1994).

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .." 42 U.S.C. § 2000e-2(a)(1). The Idaho Human Rights Act mimics this language. *See* IHRA § 67-5909.

Title VII also provides that "[i]t shall be unlawful employment practice for an employer to discriminate against any of his employees because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Again, the Idaho Human Rights Act contains nearly identical language. *See* IHRA § 67-5911.

## 1. Improper Defendant Claim

As a preliminary matter, UPS argues that Ms. Limary has sued the wrong party because United Parcel Service, Inc., an Ohio corporation, was her employer, not United Parcel Service, Inc., a Delaware corporation. (Dkt. 17-1.) UPS further alleges Ms. Limary

was put on notice of this distinction in numerous filings but failed to amend her complaint. (Dkt. 17-1.)

Ms. Limary contends that while UPS did assert this distinction in footnotes to several pleadings and discovery responses, they have not provided any evidence in support of the allegation. Ms. Limary further argues the evidence available suggests that she was, in fact, employed by Defendant UPS and, in any event, the proffered distinction is wholly irrelevant. (Dkt. 20.)

As a preliminary matter, the Court finds that UPS has not met their burden of proof to establish the absence of a genuine issue of material fact on this issue. UPS has simply alleged, without any supporting evidence, that Ms. Limary has sued the wrong party. There is no evidence in the record to support this contention and, instead, UPS has appeared in this action and provided an extensive defense to Ms. Limary's claims. In light of this conflicting position, the Court finds UPS is not entitled to summary judgment on the issue.

Moreover, Ms. Limary argues there is no functional distinction between UPS Ohio and UPS Delaware, the named Defendant. Interpreting the facts in favor of the nonmoving party and solely for the purpose of resolving this Motion, the Court finds there is a genuine dispute of material fact on this issue.

"'[U]nder the single employer doctrine, two nominally separate companies may be so interrelated that they constitute a single employer subject to liability under Title VII.'" *Wells v. Skynet Digital, LLC*, 2015 WL 4250855, at *4 (D. Idaho July 13, 2015) (quoting *Izaguirre v. Glenwood Motor Lines, Inc*., 2011 WL 5325658, *6 (D. Idaho Nov. 3, 2011) (internal quotations omitted)). "[A]n employee is deemed to have 'joint employers' if each

entity or employer 'control[s] the terms and conditions of employment of the employee.'" *Wells*, 2015 WL 4250855, at *4 (*quoting Collier v. Turner Industries Group,* 797 F.Supp.2d 1029, 1044 (D. Idaho 2011)).

"[T]wo entities should be treated as one for purposes of an employment discrimination claim if they have: '(1) interrelated operations, (2) common management, (3) centralized control of labor relations and (4) common ownership or financial control.'" *Id.* (quoting *Morgan v. Safeway Stores, Inc.,* 884 F.2d 1211 (9th Cir. 1989)). The degree of an alleged employer's (1) right to control the employee, (2) supervision of the employee's work, (3) right to set schedules, (4) power to hire and fire, (5) power to determine pay rates and method of payment, and (6) power to modify the employment conditions, are factors the Court can consider in determining if someone can be held liable as an employer; however, these factors are not mandatory or all-inclusive. *Id.* (citing *EEOC v. Pacific Maritime Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003); *Real v. Driscoll Strawberry Ass'n., Inc.,* 603 F.2d 748, 754 (9th Cir. 1979)).

There are facts in the record that would support a finding that the single employer doctrine applies here. First, UPS's Code of Business Conduct provides for the policy and "standards of conduct for all of UPS." (Dkt. 17-11, Ex. 1). The Code of Business Conduct does not distinguish between UPS entities leading to the reasonable inference that it applies to all UPS entities. Second and similarly, UPS's Professional Conduct and Anti-Harassment Policy does not appear to distinguish between UPS entities. (Dkt. 17-11, Ex. 2.) Furthermore, both policies were produced by UPS Delaware in this litigation to demonstrate what policies applied to Ms. Limary's employment with UPS. Third, UPS's

Corporate Disclosure Form reflects that UPS Delaware is the parent corporation of UPS Ohio and owns all of UPS Ohio's outstanding public stock. (Dkt. 2.)

Together, these facts support a reasonable finding that Defendant, UPS Delaware, is not improperly named because: (1) it has complete common ownership and financial control over UPS Ohio and (2) Ms. Limary was subject to common policies that applied to all UPS employees, including those employed by UPS Ohio. Thus, summary judgment is denied on Defendant's argument that Ms. Limary has sued the wrong party.

## 2. Retaliation Claim

Retaliation under Title VII and the IHRA follows the *McDonnell-Douglas* burden-shifting formula. To establish a prima facie case of retaliation, Ms. Limary must show that (1) she acted to protect her Title VII rights, (2) an adverse employment action was taken against her thereafter, and (3) a causal link exists between those two events. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). The burden then shifts to the employer to present evidence of a legitimate, nonretaliatory reason for the adverse employment action. *Id.* If the employer meets that burden, the plaintiff must demonstrate a genuine issue of fact as to whether the employer's justification is pretext. *Id.* An employee can prove pretext either: (1) "directly, by showing that unlawful discrimination more likely motivated the employer"; or (2) "indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849 (9th Cir. 2004) (internal quotation marks omitted) (quoting *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002)). The degree of proof necessary to establish a prima facie case for Title VII on summary

judgment is minimal and does not even need to rise to the level of a preponderance of the evidence. *Wallis*, 26 F.3d at 888.

### A. Ms. Limary Acted to Protect Her Title VII Rights.

It is undisputed that Ms. Limary engaged in protected activities. A plaintiff alleging retaliation need not prove that the employment practice at issue was in fact unlawful under Title VII; it is sufficient that she had a "reasonable belief" that the employment practice she protested was prohibited under Title VII. *See Trent v. Valley Elec. Assoc., Inc.,* 41 F.3d 524, 526 (9th Cir.1994).

In this case, Ms. Limary took action to protect her alleged Title VII rights in February 2013 by reporting Mr. Tolbert to HR and again on September 11, 2013 by filing a Charge of Discrimination with the IHRC. (Dkt. 20-1, ¶ 6, 18.)

### B. Retaliatory Adverse Employment Action

"'An adverse employment action' . . . [is] "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'" *Ray v. Henderson*, 217 F.3d 1234, 142-42 (9th Cir. 2000) (quoting EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)). The expansive view adopted by the Ninth Circuit includes "a wide array of disadvantageous changes in the workplace." *Id.* at 1240. Under this framework, adverse employment actions include, but are not limited to the following actions: "lateral transfers, unfavorable job references, and changes in work schedules." *Id.* at 1243. It may also include omissions, such as the denial of a promotion if the employee can demonstrate adequate qualifications.

*See Chuang v. Univ. of cal. Davis, Bd. of Trustees*, 225 F.3d 1115 (9th Cir. 2000) (holding denial of full time tenured teaching position constitutes adverse employment action).

The Ninth Circuit has described two "countervailing concerns" that are at issue when determining what constitutes an "adverse employment action":

> On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions. In an effort to strike the proper balance, we have held that only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation.

*Brooks*, 229 F.3d at 928-929. To establish a causal link between the protected activity and the adverse employment action, Ms. Limary must show "that the desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Southwestern Medical Center v. Nassar,* 133 S. Ct. 2517, 2528 (2013) (citing *Gross v FBL Financial Services, Inc.,* 557 U.S. 167, 176 (2009)).

### C.    *Plaintiff's Allegations of Retaliatory Adverse Employment Actions*

Ms. Limary alleges the following adverse employment actions occurred in retaliation for her reporting Mr. Tolbert to HR: her transfer to night shift; the denial of her hardship transfer request; constant harassment for her wardrobe; her ignored application for a driving position; and the receipt of harassing phone calls while she was on leave. (Dkt. 20.) Additionally, Ms. Limary alleges she also suffered retaliation for filing a Charge of Discrimination with the IHRC on September 11, 2013 as evidenced by the following

actions: Mr. Tolbert directed Shawna Herberger to blame Ms. Limary for all mistakes and errors in their department; Mr. Tolbert directed Tina Drown to dig up dirt on Ms. Limary; Mr. Tolbert staged a surveillance camera to monitor Ms. Limary's every move while on shift; and Ms. Limary was passed over for two opportunities to return to dayshift. (Dkt. 20.) Ms. Limary further alleges that, as a result of all of this retaliatory and harassing conduct, she was forced to take FMLA leave on November 20, 2014 and was constructively discharged on April 21, 2015. (Dkt. 20.)

As further discussed below, the Court finds that Ms. Limary has shown a genuine issue of material fact as to whether the denial of her hardship transfer request was a retaliatory adverse employment action. The Court also finds that Ms. Limary has shown a genuine issue of material fact as to whether, based on the totality of circumstances and as a result of her protected activity, her work environment became so harassing and hostile that she was forced to take FMLA leave and was ultimately constructively discharged.

### (1) Transfer to Evening Shift

Ms. Limary contends that Mr. Tolbert's decision to transfer her to night shift was retaliatory. (Dkt. 20.) However, Ms. Limary was transferred to night shift in January 2013 and her first protected activity did not occur until February 2013 when she reported Mr. Tolbert to HR. (Dkt. 20.) Accordingly, Ms. Limary's transfer to the evening shift could not have been a retaliatory adverse employment action and she cannot rely upon this fact to support her retaliation claim.

*(2) Denial of Hardship Transfer Request*

Ms. Limary asserts that her hardship transfer request was also denied in retaliation for her reporting Mr. Tolbert to HR. (Dkt. 20.) UPS maintains that Ms. Limary's hardship transfer request was denied due to her low QPR scores and was not retaliatory. (Dkt. 26.)

The Court finds, under the circumstances presented here, that denial of the hardship transfer request may constitute an adverse employment action. *Cf. Bukiri v. Lynch*, 648 Fed. Appx. 729 (9th Cir. 2016) (denial of hardship transfer request did not constitute adverse employment action because policy expressly excluded hardships that arose prior to employment). There is a genuine dispute of fact regarding Ms. Limary's qualification for the hardship transfer and this dispute cannot be resolved on summary judgment.

UPS asserts that an employee is only eligible for transfer if he or she is a fully acceptable performer, which it maintains Ms. Limary was not. (Dkt. 26.) Ms. Limary argues that this is pretext because her relevant QPR score, her 2012 mid-year score, showed she was, in fact, a "Fully Acceptable Performer." (Dkt. 20-1, SODF ¶ 14.)

UPS contends that Mr. Grant relied upon Ms. Limary's 2011 year-end and 2012 year-end QPR scores when he reviewed and ultimately denied her transfer request, which rated Ms. Limary as "Significant Improvement Needed" and "Improvement Needed," respectively.  (Dkt 17-10, Grant Affidavit ¶ 10-14; Dkt. 17-11, Ex. 4.) However, in an email summarizing the material considered when reviewing the transfer request, Mr. Nelson told Mr. Grant that Ms. Limary's 2012 mid-year QPR was the most recent score available at the time. (Dkt. 21, Ex. 4.) Mr. Nelson's email incorrectly stated that her 2012 mid-year QPR score rated Ms. Limary as "Improvement Needed" and her 2012 year-end

QPR score rated her as a "Fully Acceptable Performer." (Dkt. 21, Ex. 4.) Contrary to this email, the record shows that Ms. Limary received a "Fully Acceptable Performer" rating on her mid-year 2012 QPR. (Dkt. 21, Ex. 3.) During his deposition testimony, Mr. Nelson asserted that his email incorrectly referenced Ms. Limary's 2012 mid-year QPR as the most recent rating, when her 2012 year-end QPR was actually the most recent available and, as such, was the score relied upon in denying her transfer request. (Dkt. 22-5, Nelson Depo. at 68.) Mr. Nelson also stated that "miskeying" was to blame for his flip-flopping her 2012 mid-year to the 2012 year-end. (Dkt. 22-5, Nelson Depo. at 68.)

In short, while UPS offered a nonretaliatory explanation for Ms. Limary's denied transfer request, Ms. Limary has identified facts that bring that justification into doubt. Interpreting the facts in favor of the nonmoving party, Ms. Limary has raised a genuine issue of material fact as to whether UPS's explanation is pretextual.

Moreover, given the proximity in time between Ms. Limary reporting Mr. Tolbert to HR and the denial of her hardship transfer request, the Court finds Ms. Limary has set forth sufficient facts to meet the *prima facie* requirement of causation specific to this issue. Ms. Limary's hardship transfer request was denied on or around March 1, 2013, which was within one month of her report of Mr. Tolbert to HR. On these facts, the Court finds a reasonable inference can be made that her hardship transfer request was denied for retaliatory reasons.

### *(3) Driving Position Application*

Ms. Limary contends that her letter of interest for the off-the-street driving position was wholly ignored by UPS in retaliation for her report of Mr. Tolbert to HR. (Dkt. 20.)

The Court finds that Ms. Limary has failed to create a genuine dispute of fact on this issue, because the undisputed facts reflect that she was not qualified for the position and was not treated any differently than the other unqualified applicants for the position.

"[I]f a transfer to a 'position was not made available to [plaintiff] because of her involvement in protected activities,' then she suffered an adverse employment decision. *McAlindin v. County of San Diego*, 192 F.3d 1226, 1239 (9th Cir. 1999) (quoting *Bouman v. Block,* 940 F.2d 1211, 1229 (9th Cir. 1991)). If Ms. Limary's letter of interest was ignored and she was not given a fair chance to get the driver's position this could constitute an adverse employment action to the extent she was otherwise qualified for the position and her application was ignored because of her involvement in protected activities.

Ms. Limary expressed interest in an off-the-street driving position with UPS by email on June 24, 2013. (Dkt. 17-3, Ex. 1.) By early September 2013, Ms. Limary had not heard anything about the position. (Dkt. 20.) On September 16, 2013 Ms. Limary sent a follow-up email inquiring as to why she never received any response or acknowledgment about her letter of interest. (Dkt. 17-3, Ex. 3; Dkt. 21, Limary Affidavit ¶ 18.) Mr. Johnson sent a response email on September 17, 2013 apologizing for a lack of response, explaining that it was his common practice to provide notice to those that made the first cut, and explaining what he looked for in moving candidates on to the next step. (Dkt. 17-3, Ex. 3.) Further, he explained that while Ms. Limary did not currently have the experience he was looking for to fill the position, if she would "like the opportunity to run an operation and get the experience of employees reporting directly to [her] to let [him] know." (Dkt. 17-3, Ex. 3.)

The Court finds the UPS's nonretaliatory explanation for their conduct is not reasonably subject to dispute. The undisputed facts demonstrate Ms. Limary's letter of interest was treated in the same manner as the other applicants. Mr. Johnson reviewed all candidates that were interested in the position and eliminated those that were not enrolled in the Management Assessment and Promotion Program ("MAPP") to narrow down the pool. As a result, Ms. Limary and Douglas McKillop were eliminated as potential hires for this position and Mr. Johnson did not provide notice to either candidate because it was his general practice to only notify candidates who made the first cut. (Dkt. 17-3 at 3, ¶ 9.) The only candidates who made it to the next stage of the hiring process were highlighted in green on Mr. Johnson's spreadsheet and all were either enrolled or in the process of enrolling in MAPP. (Dkt. 17-3, p. 7.)

In short, UPS has met their burden by providing a nonretaliatory explanation for how Ms. Limary's application for the off-the-street driving position was handled. This evidence defeats both causation and also provides a nonretaliatory reason for the alleged misconduct: Ms. Limary and Mr. McKillop were not enrolled in MAPP and therefore did not make it to the next step in the interview process or receive a phone call or email explaining that their applications were denied. Ms. Limary has not provided evidence to establish this nonretaliatory explanation was pretext.

### (4) Day Shift Opportunities

Ms. Limary contends that "UPS passed over two opportunities to return [her] to day-shift hours by awarding the open positions to Stephanie Leggeman and Jennifer Compton." (Dkt. 20.) Ms. Limary argues that those positions were "lateral" moves; she had more

seniority than Ms. Leggeman and Ms. Compton; and Ms. Leggeman agreed to switch Ms. Limary shifts, taking the evening shift so that Ms. Limary could work day shift. (Dkt. 20.) UPS maintains that Ms. Limary did not suffer retaliatory adverse employment action when she was not given either of these positions because the positions were for different positions; Ms. Compton's position was filled prior to Ms. Limary's move to the evening shift; and Ms. Leggeman did not agree to switch shifts with Ms. Limary. (Dkt. 26, Dkt. 17-8, Taylor Affidavit ¶ 3; Dkt. 22-3, Tolbert Depo. at 157-159.)

There can be no adverse employment action in the context of a "failure to hire retaliation" where an individual did not apply for the position. *See Kamdem-Ouaffo v. Idahoan Foods, LLC*, 2017 WL 1073350, at *9 (D. Idaho Mar. 20, 2017) (citing *Valez c. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006)). Ms. Limary does not allege she applied for either of the positions the other women ultimately filled and Phil Taylor, Division Manager of the Idaho Division, provides sworn testimony establishing that she did not. (Dkt. 17-8, Taylor Affidavit ¶ 4.)

Ms. Limary testified that she "express[ed] interest of moving around within the company," but has not alleged she expressed interest in either of these open positions, knew those positions were available at the time or in retrospect, or that she was qualified for those positions. (Dkt. 17-14, Limary Depo. at 113-115.) Again, despite viewing the facts in the light most favorable to Ms. Limary, the Court does not find that Ms. Limary applied for these positions. Accordingly, she cannot establish that UPS retaliated against her by failing to provide her with opportunities to transfer to the day shift.

### *(5) Other Allegations of Retaliatory Harassment*

Ms. Limary alleges that she was constantly harassed about her wardrobe, despite being in compliance with UPS's dress code; UPS harassed her with phone calls when she was on leave while her son was in the hospital for three days; Mr. Tolbert installed a surveillance camera to watch her while she was on shift; and Mr. Tolbert instructed other female employees to dig up dirt on her and blame all mistakes on her. (Dkt. 20-1.)

Retaliatory "[h]arassment is actionable only if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ray*, 217 F.3d at 1245 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). Like a hostile work environment harassment claim, retaliatory harassment requires that the alleged harassment "be both objectively and subjectively offensive." *Id.* "To determine whether an environment is sufficiently hostile, we look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, (1998)).

### *(a) Wardrobe Harassment*

Ms. Limary asserts that after reporting Mr. Tolbert "she was constantly harassed over her wardrobe." (Dkt. 20.) UPS argues that comments regarding Ms. Limary's choice to wear pumps was out of concern for Ms. Limary's safety. (Dkt. 26.)

Ms. Limary describes the harassment as Mr. Tolbert "ask[ing] if [her] uniform, or [her] stuff, was within the guidelines." (Dkt. 17-14, Limary Depo. at 102.) Ms. Limary

alleges she was told to follow different guidelines at different times, one guideline allowed her to wear pumps and another allowed her to wear shorts, which led to her confusion and constant harassment by Mr. Tolbert. (Dkt. 17-14, Limary Depo. at 103-104.) Ms. Limary testified during her deposition that the issues regarding her wardrobe ceased when she stopped wearing pumps. (Dkt. 17-14, Limary Depo. at 204-05.)

No reasonable juror could find the comments Ms. Limary received concerning her wardrobe, either alone or combined with other acts of alleged harassment, were sufficiently severe or pervasive to support a retaliatory harassment claim. Ms. Limary has not described that she was singled out or treated differently from anyone else, and the concerns expressed about her shoe choices were both reasonable and safety-related.

*(b) Phone Calls*

Ms. Limary had to leave work suddenly when her son was hospitalized. (Dkt. 17-14, Limary Depo. at 106.) When she called to follow up on her departure Mr. Tolbert gave her the time off, but "asked [her] questions as far as like, what was going on, how long it would be . . ." (Dkt. 17-14, Limary Depo. at 106-107.)

No reasonable juror could find this communication, either alone or combined with other acts of alleged harassment, was sufficiently severe or pervasive to support a retaliatory harassment claim. Ms. Limary has not described that she was singled out or treated differently from anyone else, and the questions she was asked appear abundantly reasonable under the circumstances. By all accounts, this was an isolated incident where UPS was trying to gather information on Ms. Limary's status so they could get coverage

for her shift while she was gone, which Ms. Limary essentially acknowledged in her deposition. (Dkt. 17-14, Limary Depo. at 106-107.)

*(c) Surveillance Camera and Co-Worker Recruitment*

Ms. Limary alleges that, after she initiated a Charge with the Idaho Human Rights Commission, Mr. Tolbert staged a surveillance camera to monitor her activities throughout the work day and recruited her co-workers to dig up dirt on her and to blame her for any mistakes made in her section. (Dkt. 21, ¶ 19-22.) These allegations, supported by Ms. Limary's sworn testimony, are sufficient to create a genuine dispute of material fact as to whether Ms. Limary suffered retaliatory harassment.

Ms. Limary contends that Mr. Tolbert "staged a surveillance camera to monitor [her] every move while on shift." (Dkt. 21, ¶ 22.) In addition, Ms. Limary alleges that Mr. Tolbert instructed Ms. Herberger "see to it that all mistakes made in Ms. Limary's section of employment were blamed on [her]" and following that directive Ms. Herberger not only blamed mistakes on Ms. Limary, but also instructed another coworker to do the same. (Dkt. 21, ¶ 19-20.)

UPS argues that the camera was installed in response to office vandalism and was taken down after a week with no effect on Ms. Limary's employment. (Dkt. 26.) UPS further argues that Ms. Herberger has denied Ms. Limary's allegations and Ms. Limary has provided no factual support for her contention. (Dkt. 26.)

The Court finds these allegations, taken together, create a genuine dispute of material fact concerning retaliatory harassment. Making every reasonable inference in Ms. Limary's favor, the Court finds her testimony provides evidence sufficient to demonstrate

that this conduct was taken in retaliation against Ms. Limary for filing a Charge with the Idaho Human Rights Commission. Furthermore, this conduct is not trivial and could have a chilling effect on employee complaints- whether or not any dirt was actually acquired via video surveillance or employee recruitment. A reasonable juror could find, as Ms. Limary alleges, that this conduct was so intolerable that it was harder for Ms. Limary to conduct her own tasks and made Ms. Limary "an object lesson about the perils of complaining about sexual [discrimination] in the workplace." *Ray*, 217 F.3d at 1245.

### *(6) FMLA Leave and Constructive Discharge*

Ms. Limary argues that she took FMLA leave due to the emotional and physical toll of the hostilities in the workplace. (Dkt. 20.) Ms. Limary contends that she was constructively discharged from her employment at UPS due to a continued course of retaliatory conduct. (Dkt. 1-2 ¶ 42; Dkt. 20.) UPS contends that Ms. Limary took FMLA leave due to a collection of psychological stressors unrelated to her employment with UPS and she was not constructively discharged but quit because she was "uncertain" what would happen when she returned to work. (Dkt. 26, citing Dkt. 17-14, Limary Depo. at 246-247.)

The plaintiff has the burden in a claim of constructive discharge to prove two elements: (1) that "[she] was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and (2) that [she] actually resigned." *Green v. Brennan*, 136 S.Ct. 1769, 1777 (2016) (citing *Pennsylvania State Police v. Suders,* 542 U.S. 129, 148 (2004)). The Ninth Circuit has set a high bar for a claim of constructive discharge. *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). "[C]onstructive discharge requires some aggravating factors, such as a continuous pattern

of discriminatory treatment." *Brooks,* 229 F.3d at 931 (citing *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989)). "[A] single isolated incident is insufficient as a matter of law to support a finding of constructive discharge, we have upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years." *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007) (internal citations and quotations omitted).

The proper lens for a constructive discharge claim is from the perspective of a reasonable person considering the totality of the circumstances. *See Wallace*, 479 F.3d at 625. "'Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury.'" *Id.* at 626 (quoting *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1411 (9th Cir. 1996)).

Examining the record as a whole, including Ms. Limary's allegations of retaliatory harassment, and making every reasonable inference in Plaintiff's favor, the Court finds that Ms. Limary has set forth sufficient facts to create a genuine issue of fact on this issue. The evidence is sufficient to allow the jury to decide: (1) whether Ms. Limary was constructively discharged from her employment and/or (2) whether Ms. Limary's use of FMLA and constructive discharge were adverse employment actions caused by the UPS's retaliation.

Ms. Limary applied for, and was granted, continuous FMLA leave on November 20, 2014 through February 20, 2015. (Dkt. 20.) Ms. Limary testified that she took leave due to "[t]he retaliatory write-ups, discipline" and the emotional stress of UPS telling her she would get to go back to dayshift and it not happening. (Dkt. 17-14, Limary Depo. at

181.) Ms. Limary also cited her mental health and stress as reasons for taking leave and her medical records reflect additional stressors including financial issues, divorce, educational problems, family problems, primary support group problems, and relationship problems. (Dkt. 17-14, Limary Depo. at 181-182.)

Ms. Limary did not return to work and had no communication with UPS until sometime in March 2015 when she spoke to Mr. Shreeve. (Dkt. 17-7, Shreeve Affidavit ¶ 4; Dkt. 17-4, Ex. 2.) On April 2, 2015, Ms. Limary met with Mr. Shreeve at the Nampa Center and they spoke with Ms. Lahaszow about providing additional documentation to retroactively excuse her absence since February 20, 2015. Additionally, Ms. Lahaszow informed Ms. Limary that since she had taken leave UPS had become aware that Ms. Limary was dating a driver at the Nampa Center in violation of UPS's conflict of interest policy so when she was ready to return to work Ms. Lahaszow would work with her to find other potential roles that would avoid the conflict of interest. (Dkt. 17-2, ¶ 40, 42.) Ms. Limary's absences were retroactively excused with documentation from her health care provider stating that Ms. Limary was unable to perform "customer service, organization, supervision," which were essential functions of her position. (Dkt. 17-4, Ex. 3.) On April 21, 2015, Ms. Limary, through her attorney, sent a letter to UPS notifying them of her constructive discharge. (Dkt. 20-1.)

UPS contends that Ms. Limary's work conditions were improving before she took leave, which undercuts her argument that she was forced to leave because her working conditions had deteriorated to the point they had become "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable

employee to remain on the job to earn a livelihood. . . ." *Brooks*, 229 F.3d at 930. For example, in October 2014, Mr. Tolbert moved Ms. Limary to an earlier shift (1:30 p.m. to 7:00 p.m.). (Dkt. 17-9, Tolbert Affidavit ¶ 8-9.) On November 11, 2014, Mr. Tolbert told Ms. Limary he would return her to her preferred day shift after the New Year. (Dkt. 17-19, Ex. 1.)

Nevertheless, while "'[t]he frequency and freshness of the instances of harassment *may* enter into' a jury's determination of constructive discharge, . . . a jury is free to find constructive discharge 'under *all of the circumstances.*'" *Wallace,* 479 F.3d at 628 (*Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110 n. 2 (9th Cir. 1998)). Thus, this Court finds that a reasonable juror could conclude, based on the totality of the circumstances, Ms. Limary suffered adverse employment actions when she took FMLA leave and was constructively discharged and these adverse employment actions were caused by the retaliatory harassment she experienced at work.

### 3. Sexual Discrimination- Hostile Work Environment

In her First Amended Complaint and Demand for Jury Trial, Ms. Limary asserts a sexual discrimination hostile work environment claim. (Dkt. 1-2.) This claim was addressed in UPS's summary judgment motion. (Dkt. 17.) However, Plaintiff's response focused solely upon her sexual discrimination disparate treatment claim. (Dkt. 20). Accordingly, the Court finds Ms. Limary has failed to demonstrate a genuine dispute of fact that would preclude summary judgment on her hostile work environment claim.

4.      **Sexual Discrimination- Disparate Treatment**

Consistent with Ms. Limary's retaliation claim, her sexual discrimination claim follows Title VII's burden-shifting formula. First, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004). If the plaintiff succeeds in doing so, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct." *Vasquez*, 349 F.3d at 640. If the employer articulates "such a reason, the burden shifts back to the [employee] to show that the employer's [stated] reason is a pretext for discrimination." *Id.*

In the discrimination context, the plaintiff has two alternative ways to establish a *prima facie* claim that gives rise to an inference of unlawful discrimination. *Id.*; *Wallis*, 26 F.3d at 889. One way is for the plaintiff to demonstrate: (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably. *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, (9th Cir. 1997); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Alternatively, the plaintiff may provide "more direct evidence of discriminatory intent." *Id.* (citing *Wallis,* 26 F.3d at 889). Ms. Limary contends that she satisfies both tests.

### A. Ms. Limary Has Not Made a Prima Facie Case of Gender Discrimination Through Direct Evidence.

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Vasquez*, 349 F.3d at 640 (internal quotations

omitted). Further, where, as here, direct evidence is alleged through discriminatory remarks, there must be a nexus between the discriminatory remarks and the subsequent employment decisions. *Id.*

Ms. Limary generally contends that Mr. Tolbert "favored male employees and treated female employees poorly" and that each subsequent employment action taken against her was a result of his less favorable approach to her because she was a woman. (Dkt. 20.) However, this is a bald and conclusory allegation. The only specific support Ms. Limary offers for this conclusion is that on two occasions, Mr. Tolbert referred to Ms. Limary's female coworkers in a derogatory manner referring to one as a "stupid bitch" and another as an "old hag." (Dkt. 17-4, Limary Depo. at 80-90.). In addition, Ms. Limary reports that Mr. Tolbert said one female co-worker was "old and needed to retire" and he did not like another and wanted her fired. *Id.* Ms. Limary contends Mr. Tolbert did not refer to or speak about male employees in this same manner.

Certainly, the terms "hag" and "bitch" are derogatory terms used specifically in reference to females. However, the terms were used on only two occasions in reference to Ms. Limary's coworkers. Further, the comments stopped after UPS spoke with Mr. Tolbert about appropriate language in the workplace. In addition, Ms. Limary has not drawn the requisite connection between Mr. Tolbert's use of these terms generally and in reference to her co-workers and the adverse employment actions she allegedly suffered. Even reading every fact in the record in the light most favorable to the Plaintiff, the Court finds there is no direct evidence of discriminatory animus.

### B. Ms. Limary Has Not Made a Prima Facie Case of Gender Discrimination Through the McDonnell Douglas Factors.

Ms. Limary cannot demonstrate a *prima facie* case through the *McDonnell Douglas* factors. It is undisputed that she is a member of a protected class and there are disputes of fact that preclude summary judgment as to her job performance and whether she suffered adverse employment actions. The central problem for Ms. Limary is she has not demonstrated that similarly situated males were treated more favorably than her. *See Aragon v. Republic Silver St. Disposal, Inc.,* 292 F.3d 654, 660 (9th Cir. 2002).

"Whether two employees are similarly situated is ordinarily a question of fact." *Hawn v. Executive Jet Management*, 615 F.3d 1151, 1157 (9th Cir. 2010). And while "the employees' roles need not be identical; they must . . . be similar in all material respects." *Id.* at 1157 (quotation marks omitted).

As general support for her gender discrimination claim, Ms. Limary identifies male employees she says were treated more favorably than her. These include: Jim Lovett, Steve Westendorf, Eric Beck, and Matt Addleman. (Dkt. 17-14, p. 94.) However, at her deposition, Ms. Limary admitted: (1) these employees were not similarly situated; and (2) her only basis for claiming these individuals were treated more favorably was her perception that Mr. Tolbert was more "responsive" to them. (Dkt. 17-14, pp. 94-99). Furthermore, Ms. Limary puts forth no connection between the alleged adverse employment actions she suffered and the relative treatment of the allegedly similarly situated male employees.

For example, Ms. Limary complains about her transfer to night shift; however, that decision was made between three female employees. Two of the female employees kept their day shifts and Ms. Limary, who had the least experience, was transferred to night shift. In addition, with specific regard to the rejection of her hardship transfer, Ms. Limary has not made any allegations or offered any evidence that would suggest male employees were treated more favorably. Finally, as to Ms. Limary's letter of interest in the off-the-street driver's position, she was treated the same as the one similarly situated employee who was also not enrolled in the MAPP program, and that employee was a male.

In short, Ms. Limary has not met her burden to show a genuine dispute of material fact as to whether any similarly situated male employees were treated more favorably than she was because of her gender. Accordingly, she has failed to establish a *prima facie* case of discrimination. There is simply no evidence for a reasonable juror to conclude that gender animus was the cause of the adverse employment actions alleged by Ms. Limary. Therefore, summary judgment should be granted in favor of UPS on Ms. Limary's gender discrimination claims under Title VII and the IHRA.

## CONCLUSION

Ms. Limary has established genuine issues of material fact that preclude summary judgment on her retaliation claims. In contrast, her sexual discrimination claims fail. She has not established the record necessary to demonstrate sexual harassment either in the form of a hostile work environment or disparate treatment. Accordingly, those claims must be dismissed as a matter of law.

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED that Defendant's Motion for

Summary Judgment (Dkt. 17) is **GRANTED IN PART and DENIED IN PART**. The

Motion is granted with respect to Ms. Limary's gender discrimination claims. The Motion

is denied with respect to Ms. Limary's retaliation claims as explained more fully herein.

DATED: September 20, 2017

Edward J. Lodge
United States District Judge